And please watch your clock for, if you're saving time for rebuttal. Yes, and good morning, Your Honors. Roger Flynn for Western Watersheds Project and the other conservation groups. And may it please the Court, I'd like to reserve four or five minutes for rebuttal, if possible. Thank you. Of your tan? Yes, sir. Okay. You know, this case comes to us at a unique posture. The district court found that BLM violated, essentially, its Organic Act, its most fundamental statute governing its operations, the Flipman, the Federal Land Policy Management Act, in illegally assuming that the mining company had rights to occupy, as the district court found, the 1,300 acres for the waste dumps. And that was, we felt that was the correct decision by the court, and there was no cross-appeal. So the government has realized that that is the status of the case. Well, not only that, but he sent it back, didn't he, to the BLM? Yes, she remanded the case, but one of the issues that I'll be talking about, and I'm sure the court is interested in, is on the vocature issue. She found that... We got on the vocature issue, but as to the first issue about determining whether the BLM should have applied certain RMP provisions, you won on that, went back to the BLM, and as I understand, then the BLM rethought it through and suggested that you'd at least won on eight of the issues, or so it seems to me that's an issue for the district court, isn't it? Not me. Well, on the, if I could make a slight correction, the district court did not rule on whether they complied with the RMP. That's one of our... Well, he sent it back to BLM to decide, and the BLM decided. Right. The remand was on whether the mining claims were valid, and that's what the BLM did last month. And so, but I before this court is January 2021, when the record of decision was issued, that violated federal public land and mining law. But you've already had that sent back, and the BLM's now thought about it again and put up a decision. Why wouldn't we just let the district court decide whether that decision was good or not? Why should I take that up? All right, well... It seems to me, I was surprised you even wanted me to talk about it. Seems to me the other side should have talked about it, and they didn't appeal. So evidently, they haven't got anything to say about it. They like having the BLM talk first. And now, if you don't like what the BLM did, it seems to me you ought to go see the district court, not us. Yes, and that is very possible that we would do that, and other parties may do that as well. Not even possible. If you're gonna do anything about it, that seems to be where you gotta go. That's right, Your Honor. But in the meantime, thousands of acres of public land are being essentially clear-cut. All the sagebrush priority, sagebrush habitat in the BLM's RMP. Well, you better get the district court on the on the stick then. Right, but... I mean, my worry is that I don't really have that issue in front of me. It seems to me I've got all these other violations in front of me, and I'm gonna, we're gonna do our best to deal with those, but that particular issue is not quite here yet. The district court needs to decide whether the BLM did it right. Right, well, I think the issue before, Your Honors, is when you have an illegal agency decision that allows immediate environmental and cultural resource damage, should that be vacated? So you're going to vacature? Yes, well, I go to vacature, what's my standard of review? It's abusive discretion, Your Honor. And does the APA compel vacature? Well, the, it's not an automatic. It's not compelled at all, is it? Well, it's totally in the discretion of the trial judge. Right, it's an abusive discretion, yeah, that's exactly correct, Your Honor. And so, at that point, if it's in the discretion of the trial judge, what is the standard by which the trial judge, I could find the trial judge had made an abuse of discretion decision? What is the standard? What is the abuse, what abuses were occurring? What have I got to get for this abuse? Right, the, there are a number of abuses. No, what is the standard? Not as what's your argument about what he did wrong, what is the, or she, sorry, what is the standard by which I would review her decision, if it's an abuse of discretion? I would look at the, the vacature case law in the Ninth Circuit. I know, I would too, and so therefore, it would be what? What is the standard? Don't I have to find that, what do I have to find the district court did wrong? What do I have to find? Right, one of them is if she misconstrued the law. Yes. Right, and so that's what we had argued in the briefs about her issues dealing with mining claim validity, but all sides agree that whether the claims are valid, whether the new BLM decision is legally correct or not, that's not before this court. And so, one of the presumptions is in favor of vacature, and only rare and limited circumstances. And one of the things that you have to look at in the Ninth Circuit on vacature is the disruptive consequences. There's the seriousness of the agency error, and then the disruptive, excuse me, disruptive, disruptive consequences. I guess I asked the wrong question, that's where I were. I am weighing the seriousness of the error against the disruptive consequence of the interim change that may itself be changed, right? Right, exactly. And so we feel that there were serious errors. For example, she did not, excuse me, the district court did not look at the environmental consequences of not vacating. All the Ninth Circuit cases dealing with environmental issues look at the environmental consequences. The famous Idaho farm burial case from 95, just last year, Center for Food Safety versus Reagan. They all balanced the environmental damage versus of not vacating. That would happen here, and she didn't look at that, and we think that's an abuse. It seems to me that the biggest part of your argument is that Rosemont should have changed what they were thinking. Would you agree with that? Yes, Your Honor. And when did the Rod issue? January of 21. And when did Rosemont issue? I remember that well, May 12th, 2022. So, you're saying that this Rosemont case, which came down after the Rod, somehow should be the standard by which we engage the Rod when it was issued? Well, yes, the decision in Rosemont actually noted that the BLM, but that was a Forest Service case. I understand it wasn't even the BLM. Right, and it basically said that the over a hundred years of precedent. And so, the fact that the BLM says, well, we weren't aware of that we were violating the law, I don't think it's an excuse not to justify a decision. And essentially, the agency wants to rely on what happened this May to defend what it did in January of 2021. I see I have about two minutes left, if I can save that for rebuttal. I do have one question, though. I think you're arguing, or maybe it's one of your other appellants, you're arguing that Rosemont applies to water lines as well as electrical lines? That is more Mr. Corolla's argument, but yes. I'll save that question for him. Yeah, okay, thank you. Thank you. Good morning, may it please the court. My name is Dominic Corolla, representing Bartell Ranch Appellants. If possible, I would like to try to reserve one or two minutes of my time for rebuttal. I thought we just had him giving rebuttal. Oh, no, I'm sorry. I didn't pick that part up. I'd like to try to have some rebuttal, because I plan to focus a lot on our NEPA claims, which weren't briefed We'll give you one minute. Okay, thank you, Your Honor. So we do join in Mr. Flynn's argument about Flipma and Vacature. To get to your question right away, Your Honor, Judge Lee, we did argue in the district court that sort of this dogleg of the project that includes the transmission line and power lines is covered by Rosemont. Our position is pretty simple, which is just simply that Rosemont said what it said about valuable minerals being required, and the Rosemont was limited to tailstacks, and our position is that that's what was at issue at Rosemont, but the language of Rosemont is much broader. Okay, so my question here, and this just may betray my ignorance of how things work here in mining, but when you have transmission lines, water lines, I assume they spread out over miles and miles, you know, to get the water or electricity to the site. So as a practical matter, does that mean BLM has to find there's valuable minerals underneath where the entire transmission line spreads, and what if there's, you know, five miles of line, but there's just one little area where there's no valuable mine? That means you just can't. I agree with you completely, Your Honor. In fact, and this gets back to what I really want to talk about, which is on to Bejeweled in the NEPA case. There you had a private wind farm, and they had to convey electricity across BLM land through a right-of-way, a Part 2800 right-of-way. BLM states in their briefing in this case that they could have authorized it under a Part 2800 right-of-way, but they didn't. They chose to find that was authorized under the mining law, despite the fact there's no valuable minerals. So to your point, yes, they do do that all the time, and they can do that under different regulations, under which the RMP and the visual standards and everything else would apply, but that's not what BLM did here. That's the distinction that I think is critical here. So, you know, I would like to talk about NEPA, and I do think that ultimately, you know, I have limited time. Ultimately, I think that this case is controlled by on to Bejeweled on the NEPA claims. I think that case stands for the fact that when you have reported baselines of important resources in EIS that are contradicted by record evidence, arbitrary and capricious decision-making results. It violates NEPA's requirement for informed decision-making, and it violates NEPA's requirement for scientific integrity, and I think that's all what you have here. And I, you know, I would go to what the BLM said in response to comments. This was that Martell ER 648, they adopted the LNC contractor's response to comments to say site visits and photographs available in seeps and springs surveys confirm zero flow conditions. That's a false statement. We've shown that in our briefing, but that's not what the record evidence shows. The record evidence shows that there was numerous seeps and springs that are essential to my client's ability as a housing permittee, and as a private landowner, and as a water right holder, to be able to use these lands. And they reported many of those resources as zero, under-reported. And is it the government's response that ultimately it wasn't that material? Yeah, and I think on to Bejeweled again addresses that as well. It is absolutely material, because number one, it's highly prejudicial to my client in the arid region of the high desert in Nevada. I mean, a couple gallons a minute can be the difference of whether he can stock water his cattle or not. So it's highly prejudicial to my client. And under on to Bejeweled, again, they talked about how if you don't get the baselines right, you can't even begin to evaluate the problem. You can't even begin to evaluate the impacts. And again, that's why I say on to Bejeweled controls here. And I think it's really, it's exactly that same case. And I think that, you know, ultimately, yes, Oregon versus Jewell, I guess that's the one you're, I always say Oregon versus Jewell, but I expect that's the one you're quoting. Yes. Doesn't that case say that the establishment of the baseline is not an independent legal requirement, that instead it is rather a to identify the environmental consequences of a proposed agency action? I completely agree, Your Honor, but I... And therefore, if I'm looking at those baseline conditions, and I'm applying an abuse of discretion standard here in those particular cases, I'm trying to figure out, I went through Pronghorn, I went through wildlife, I went through a water resource baseline and the stream baseline data, the groundwater baseline, each one of those to look at what the, if you will, the agency had done and what they've said, and I'm trying to figure out which is the one which is the abuse of discretion. I'm not sure I completely understand your question. I think on to Bejeweled stands for the proposition what I stated earlier, which is that if an EIS misreport data, it states baseline conditions that are inconsistent with record evidence, it's arbitrary and capricious under NEPA. And I'll say, I mean, unfortunately, I was on the losing end of that case. I represented Harney County as an intervener defendant in that case, and I can tell you it was based on one survey that didn't even come to light until we got to the Ninth Circuit, and it showed that sage-brows were present in this area that the government said weren't there. And that was enough for this court to say, you can't make that misrepresentation in an EIS and not violate NEPA. And here, we have multiple issues of the misreporting springs. I read the statement to you. Spring surveys confirm zero flow conditions. That's an inaccurate false statement, and it's highly prejudicial to my client. Thank you. Thank you. Good morning. May it please the court. I'm Rick Dysett on behalf of the Burns Paiute Tribe, and I'm going to use my entire four minutes. I will address the tribe's National Historic Preservation Act 106 claim in my limited time. The parties here don't dispute the law. Section 106 requires federal agencies to consult with any Indian tribe that attaches religious and cultural significance to a property. NHPA regulations specifically require the BLM to make a reasonable and good faith effort to identify Indian tribes that shall be consulted in the 106 process. There's also no dispute as to the religious and cultural significance of Thacker Pass to the tribe. In its 2021 order denying a preliminary injunction, the district court stated, Defendants do not dispute. The tribes consider the entire Thacker Pass area sacred. But didn't the BLM contact the BP tribe and ask it to consult and provide input? Actually, in this case, the Burns Paiute was never contacted in regards to the Thacker Pass project. There are other projects that the tribe was contacted in regards and did not respond, but not this project specifically. They did contact three tribes specifically. I got the idea that they were contacted. Not only did they not respond, there was a rep that said, We'll defer to the tribes that are closer to the study area. It's not even necessary to keep the tribe on the mailing list. So in 2005, on a different project, this was a resource management plan, the tribe said, Contact the local tribes. You can take us off the mailing list for the resource management plan and the EIS. They didn't indicate they never wanted to be contacted. The resource management plan and EIS for this project? For the entire Winnemucca district. So for a broad landscape. They didn't indicate they didn't want to be consulted again in the future. And in fact, BLM continued to reach out to consult with the tribe. In 2005, actually it was at the ethnographic assessment stage where the tribe indicated that. In 2010, the tribe was reached out to by BLM again. In 2013, in a NAGPRA repatriation matter, BLM reached out to the tribe. So they continued an effort to reach out because they knew that the tribe had historic ties to the area. In fact, that 2005 ethnographic report indicated that this area was within the tribe's aboriginal territory. And they specifically identified in that report the Burns Paiute tribe. They also recognized that Northern Paiutes, including the Burns Paiute, were concerned about potential impacts to, and protection and preservation of culturally significant areas. So you're gonna hear, and there was much ado about the fact that the tribe didn't respond. Well, it's the BLM's responsibility, once they identify a tribe that attaches significance to an area, to continue an effort to consult. And in fact, in United Ketewa Band of Cherokee versus SCC, a DC circuit case, I think the court said it well, that tribes can invoke or waive the Section 106 process as they choose. It's their obligation to consult, and tribes, as they see fit, as they see significance, can elect to consult or not. Can I ask one quick, just kind of a housekeeping question? So there's this appeal. You have another appeal related to this case? And what is that about? There is a separate appeal of a preliminary injunction addressing separate cultural resource claims that is pending before this court. Why is that a different case than this one? Why is it unrelated? Because that was raised after the court's issuance of summary judgment. It was a separately filed case, and in fact, involves several other tribes as well. Okay. And then I assume there's also... This went back... It was remanded, and I assume that will be... That's coming back to Judge Due, and that will be appealed also, I assume? In this case? Yeah, in this case. No, this is the only matter in regards to this case, unless, of course, you rule in our favor and there's additional findings. You're talking about that the government did not appeal where they lost, but it wasn't vacated. It was just... That went back down, but now it's back up to Judge Due. So I assume that if Judge Due doesn't rule in one side or the other's favor, that will also be appealed? Potentially, the matters that involve the... Matters that were discussed by the other parties here, those potentially could come back up to this court. Is that all the cases that involve this? That's my conclusion. Thank you. Thank you. May it please the court. My name is Amelia Yowell on behalf of Federal Appellees. With me at Council's table is Laura Grenier, who represents Intervenor Appellee. I will speak for 11 minutes this morning, and Ms. Grenier will speak for nine minutes. With the exception of one narrow issue that is not before this court on appeal, the District Court correctly concluded that BLM met all of its statutory and regulatory obligations in improving the mine plan to mine lithium, which is a valuable and critical mineral to our nation's economy and national security. This court should affirm the District Court's decision on both the and to remand without vacater. First this morning, I would like to talk about the issues that are not before this court, primarily the District Court's decision in favor of plaintiffs on their FLTMA claims. This court should reject plaintiff's argument that the District Court erred by not reaching the subsidiary resource management plan issues. The District Court didn't need to address whether the RMP provisions applied because it decided for plaintiffs on a threshold factual issue. And as the court is aware from our 28J letter, BLM has now completed its remand. It has determined the sufficiency of the mining claims at issue, and everyone here in the court agrees that that decision is not before this court. And so whether the RMP provisions apply should be decided given the changed factual circumstances and the new record. Second, the court should reject Bartell plaintiff's attempt to expand their claims on appeal by arguing that Rosemont should extend to the power and water lines. As the District Court recognized, Bartell forfeited that argument in a summary judgment briefing. And if this court still decides to treat the merits of this issue, it should determine that Rosemont does not extend to water or power lines. The Ninth Circuit, in its Rosemont decision, intentionally limited its decision to just the waste rock and water. It did not recall that the agency had an obligation to investigate the sufficiency of the mineralization of mining claims. It did not address any other portions of land covered by mining plans of operations. Water and power lines... But isn't the relevant language just uses the term occupancy and doesn't necessarily distinguish between infrastructure and waste rocks? Your Honor, so the Ninth Circuit in the Rosemont decision does talk about occupancy, but specifically it talks about the type of permanent occupancy that is implicated when you're piling waste rock and tailings on a rather significant area of land. And the Ninth Circuit in the Rosemont decision held that that implicates a unique concern where the court was concerned where if you're piling rock and tailings on land that presumably holds valuable minerals, then the court, in its opinion, thought that the act of the waste rock and tailings suggested that perhaps there wasn't actually valuable minerals underlying those claims because the company would be putting its waste rock on there. Can you address your friend's argument that the BLM had other statutory authority to have the infrastructure? Sure. BLM does have other statutory authority to approve water and power lines. And in fact, it does approve water and power lines as parts of many other different projects, not just mines. But simply because BLM does have the authority under separate regulatory provisions doesn't mean that it doesn't have the authority under its mining regulations to also approve water and power lines. And I assume the practical answer to that is why you didn't rely on that is Rosemont came after you had authorized it. Therefore, BLM thought it had authority, you know, pre-Rosemont regardless of the merits. That's why you didn't. I assume that's the practical answer. The practical answer, Your Honor, is that the mine operator here applied for permission to place those water and power lines as part of its mining plan of operations. So if the agency had instead of... Or if Lithium Nevada had instead applied for, say, a right of way, that would have given the agency a right of access and rights. And so BLM simply processed the application before it, which was to approve the power and water lines as part of the mining plan of operation. And it has the authority to do that under its regulations. Rosemont, I don't think, has anything to do with the water and power line approval here. So I wouldn't say that Rosemont changed or would have changed the agency's decision. It has the authority under both sets of regulations to approve this type of infrastructure. And Bartel hasn't indicated that BLM abused its discretion or its authority in approving the water or power line under... And if I can switch gears, if you could address your other friend on the other side's argument about BLM reaching out to the tribe in 05, 10, and 13, but not here. I mean, it does look a little bit odd that suddenly for this one, they didn't reach out to the tribe. Can you address that? Yeah, I'm happy to talk about that, Your Honor. First, as an initial matter, I would just stress that under the NHPA, BLM must conduct reasonable and good faith efforts to identify tribes for consultation. That's the standard here. And it's really a totality of the evidence type of inquiry. If I can just actually specify the question a little bit further, I guess, what was different about the previous inquiries from this one in which why you reached out to the tribe in those early efforts, but not here? Sure, Your Honor. So BLM did reach out to the BBT tribe in 2005 as part of its consultation on the Winnemucca RMP, which covers a broad, broad area. It's over 7 million acres of public land. And so it reached out to the tribe and 18 other tribes to identify any interest in any land within those 7 million acres. And the BBT tribe not only didn't respond, didn't engage in consultation, but they, in fact, told the agency that they would defer to tribes who had closer geographic connections to that 7 million acres of land, of which this project is just a small portion. And so BLM continued its consultation on the RMP. No tribe identified any interest in this Thacker Pass project area. And BLM reached out to tribes in consultation in other projects in the same area, and no tribe identified any interest in this particular Thacker Pass area during those consultations as well. And so the agency simply had no evidence before it suggesting that the BBT had a particular interest in the land that the Thacker Pass area was proposed on until well after the rod had issued. After the tribe had earlier said, we don't want to be on this mailing list, did the BLM ever reach out to the tribe on another related matter? So the BLM did consult with the BBT tribe on the... It's called the Elephant Mountain Cave Project, which is about 50 miles away from Thacker Pass. Importantly, that consultation was done under a different statute, not the NHPA. It was done under the Native American Graves End Repatriation Act, which casts a much broader consultation net than the NHPA. But regardless of the different statutory standards governing here, the BBT tribe didn't engage in consultation on that project either. And again, the agency didn't uncover any evidence during that consultation that would have suggested that the tribe had any interest in the Thacker Pass area, such that it would be unreasonable for BLM not to reach out to consult with them on Thacker Pass. And as I understand, the BLM also published a notice in the Federal Register about this particular project? Yes, Your Honor. BLM published multiple public notices. Although the agency acknowledges that public notices don't... That's where I was gonna go. I don't think that's enough, is it? No, Your Honor. The agency does have an affirmative obligation under the NHPA to make reasonable and good faith efforts to identify tribes. And here, they did. They identified three other tribes that had close connections to the area, and they consulted with those tribes. They did not identify the BBT for consultation. Again, because there was no evidence before the agency suggesting that the tribe had any interest in the Thacker Pass area. And that is more than enough to meet the good faith and reasonable standard under the NHPA. My standard of review on that is? So it's... You're reviewing the district court's decision de novo, but it's an APA action, so it's an arbitrary and capricious standard of review. So multiple levels of deference to the agency. Well, thank you. Great, thank you. Thank you very much. Good morning, Your Honors. May it please the court. Laura Grenier on behalf of Lithium Nevada. I'd like to first address your questions about the tribe, because we included pictures in our brief that answer this question squarely, which is, there has been substantial disturbance in this same project area for over a decade. Movement of 50,000 pounds of waste rock, a clay pit mine, trenching, access roads. In the course of all of those authorizations for all of that work and all of the work, the district court never said a word, never gave BLM any notice that this area was sacred to them, critical to them. So yes, the district court and the BLM, after the record of decision was issued and in litigation, when the BPT finally came forward and said, this area is sacred to this, absolutely acknowledged, we don't question what you believe is sacred. That's what's being used here to say, the BLM and no one else disputes that this area is sacred. So the BLM had no notice whatsoever through all of this period of time. The tribe has never come forward to explain that. With respect to expanding Rosemont here for power lines and water lines, Your Honor, I respectfully submit that would not be appropriate. Rosemont was very clear about permanent occupancy for waste rock storage, 2 billion tons of waste rock storage. As I think Your Honor acknowledged in one of your questions, you do require power lines and water, obviously, to get to a project to develop your valuable minerals. That's what we call ancillary use. The BLM has lots of authority to prove that under 3809 or under 3715. And actually, the record of decision at 3WWPER350 says the BLM was acting under both 3809 and 3715. In addition to that, Your Honor, there would not have to be valuable minerals under all of those areas under the mining law anyway, because Rosemont acknowledged that non mineralized areas can be used for ancillary use, even waste rock storage, if you use mill sites to locate them. So at the end of the day, there is full authority to deal with all of these questions that have been asked. And Your Honor, finally, there is no presumption in favor of Vacator in the Ninth Circuit. The burden is always on the appellants, as always on the challenging party to show that the agency acted in an arbitrary and capricious manner. The appellants here have never met that burden. Lithium Nevada spent over $8.7 million on the environmental baseline and permitting process that is before you, that the appellants are challenging. There were no shortcuts. There was no expense spared, and nor was there any corners cut when it came to with respect to mitigation. The EIS talks about, after all reclamation and all mitigation is done, there's a total of less than five acres of permanent disturbance for wildlife habitat. Less than five acres. Lithium Nevada took the extraordinary measure of pausing this project for two years before it ever got this authorization, because it did a couple million dollars of exploration so that it could relocate the entire project outside of the Montana mountains, where there is sensitive environmental areas for sage grouse and other resources. Those are extraordinary measures of avoidance and mitigation that the appellants simply ignore. Yes, there is still some habitat, some sage grouse habitat in the project area, but it is not what is being said by the appellants. Yes, the BLM looked at the 2015 armpits for the sage grouse. That habitat mapping was based on models, which is fine at the programmatic planning level. It cannot trump best available science, which you have here, because Lithium Nevada consulted with the Nevada Sagebrush Ecosystem Technical Team. Those are the experts in Nevada with the jurisdiction over the sage grouse, which is not a federally listed species. Based on a review of 49,000 acres in the project area, 113 transects on the ground, they concluded that because of wildfire and invasive species, the area had changed. And since the 2015 modeled maps, this area actually has very little sage grouse habitat at all. The only amount that is, and any of it, is not in the waste rock storage facility areas. So there's no harm being done to sage grouse in that area. The only area of any confirmed habitat, based on the best available science, is actually in the pit area, where there's unquestionably valuable minerals. Even so, the set, the Nevada agency, said, if you want to provide a net conservation gain, it will require 1,375 conservation credits, which Lithium Nevada is purchasing for over a million dollars. That provides a net conservation gain. The appellants tell you, that's not good enough, that's only for temporary impacts. But again, we have five acres of permanent disturbance discussed in the rod for permanent wildlife habitat disturbance. But even if appellants wanted to challenge that state agency decision, what was required to yield a net conservation gain for the sage grouse, they have not, nor could they do that here, because that agency that made that decision is not before you. Similar to the Wild Earth Guardians case, this court decided on June 14th, in 21.359.36, because the sage grouse are not federally listed, the state agency retains jurisdiction over the species, and what's required to yield a net conservation gain under that state agency standard. Appellants invoke FLTMA, the organic act that governs the BLM. But what they omit, importantly, is that FLTMA declared in our country's policy, quote, that the public lands be managed to recognize our nation's needs for domestic sources of minerals from the public lands, including implementation of the Mining and Minerals Policy Act of 1970. That act, at 30 U.S.C. Section 21A, declares the policy of the federal government in the national interest to, quote, foster and encourage private enterprise in the development of economically sound and stable domestic mining. These are fundamental directives under FLTMA to the BLM about the BLM from effectively withdrawing lands from mining through land use planning. Plaintiffs... Appellants acknowledge that, but it's exactly the outcome they seek here, is no mining. They want you to apply a 3% disturbance cap, or say a 3% disturbance cap should have been applied under the RMP. If that were the case, there's no project. If the LEC buffers had been applied, which are closest to the mine pit area, there is no project. They acknowledge in their briefing, in fact, they affirmatively argued that if for some reason there was some RMP issue with the stage grouse, maybe the project couldn't use lands for waste rock storage area and they would have half a mine. So they admit that their interpretation of the mining law that they asked to accept would render the mining law unworkable and defy expressed congressional objectives. In fact, it's a goal expressly stated in the resource management plan itself to, quote, make federal mineral resources available to meet domestic needs. That's at 3WWPER 409. Again, plaintiffs acknowledge this and we've repeatedly identified that there is no harm to the waste rocks in the waste rock storage area, because they've never even identified an alleged RMP violation in that area. Rather than ever identify any harm tied to that area that was remanded, that was the subject of the remand. Now, for the first time on appeal, they challenge the entire area and say, well, actually, what we were arguing at the district court was the yield of the claims, even the claims in the pit. Of course, they've never said that until we got to an appeal, because no one would spend $150 million permitting a project, defending it in federal litigation, and now constructing it for something that was not economically developable. And in fact, the undisputed evidence in the record is that there is the yield, the profit of the project will yield $1.5 billion annually. Investors don't make those kind of expenditures and no one has ever challenged it. That information is simply undisputed in the record. With respect to the water modeling, Mr. Bartell fly specs. He raises purported errors in a matter of five springs, certain measurements. There were over 40 springs measured, hundreds of data points taken by five different contractors over the course of time, review done by the BLM, review done by Plumlee, the BLM's independent contractor. Out of all of those, he picks a handful of samples, which were responded to repeatedly by the BLM. There's a thorough monitoring and mitigation plan in place. There's been ongoing monitoring of all of the water in the area since 2020, so there is two plus three years of data that will be updated before mining ever starts. And there will be a technical advisory team of experts, federal and state law, under federal and state agencies, to constantly review the status of the water. So your response to his argument that it was absolutely false, this monitoring, the reports, is? That's absolutely not true, Your Honor, and the record shows that. The reports are literally over 1,000 pages of more than a decade of monitoring. Even if... And we looked at every one of his arguments, every one. He puts pictures in the record and he disagrees with the interpretation of those pictures, which is a scientific determination. He says there should have been flow measured when you look at the picture and it's just mud, or a very little amount of water, nothing that could be measured. So we do not believe that the record supports that there was any misrepresentation or any error. But even if there were, it still would be a fly speck. And the BLM and all of the contractors that reviewed this confirmed, in fact, that the modeling showed that if you could take those points completely out of the analysis and it would make no difference. The BLM responded to every one of Mr. Bartel's comments very thoroughly, and in fact, required Pateau, the water contractor, to go back out, do more monitoring. He brought that data back, put it into the model, and it confirmed the model. But in addition to that, they added six more monitoring points to address specific concerns raised by Mr. Bartel. So the BLM and the contractors did a thorough review of this, and if there... I don't believe there were any errors, but even if there were, he has identified a minute amount of errors that would not impact the overall model, nor would they make any difference at all, given the extensive monitoring that will be going on here before mining and as mining continues, to ensure that there'll be early triggers to identify any impacts, which will be fully mitigated. Great. Thank you. That's all I have. Thank you. I wanted somebody to respond to that. Go ahead. Thank you, Your Honor. The issue is what was going on in 2021. And the BLM admitted on page 33 of their response brief that if there's no evidence of claim validity when the ROD was issued, then the RMP provisions apply. They didn't apply any of them, none of them, dealing with sage grass, visual resources, we haven't even talked about that. And so based on the record before this court, it was a serious violation of federal law. The RMP was just disregarded. The issue comes down to discretion. They said, we have no discretion over this project because all the mining claims are valid. Did you check claim validity? No, we assumed. That's illegal under Ninth Circuit law. Yes, the Rosemont decision came down after the ROD, but that decision said that position was wrong for 100 years. And so they violated the law on numerous occasions, both on what the district court found and what the district court never got to. She never ruled on whether the RMPs were violated. BLM now admits they were. And so what we have here is a decision that BLM says, well, we'll fix the error. Think what the slippery slope, I know it's a lawyer term, slippery slope this does for government authority. The only check on government authority is to vacate an illegal decision. The BLM's position here, this is the first time in public land history that we have a major project violating a number of provisions that's allowed to go forward. It's not five acres, it's 5,000 acres. There's 1,300 acres of waste rock alone, hundreds of feet high. That's not public habitat, that's not wildlife habitat anymore. And so that's what the court has to think about in the abuse of discretion in the vocature. Is this where we want to go for government agencies? Well, we made a mistake, we'll fix it down the line. The fact that they fixed it last month, it could have taken years. That's the decision on vocature. This is a dangerous road to go on if we have massive environmental damage occurring because of the failure to vacate in the face of massive environmental damage. Under the Idaho Farm Bureau case, excuse me, the Food Center for Reagan case, those all say you have to factor in the environment. The judge did not do that here. That is a reversible error, I would respectfully submit it's an abuse of discretion, and it violates Ninth Circuit case law. It's an abuse of discretion to violate, misinterpret the law. The district court made a very serious error here in not vacating this decision in face of the massive environmental damage and the serious errors that the BLM now admits happened here. And so we feel we would respectfully request that this court reverses the court's decision not to vacate the record of decision. If BLM believes it can fix the error, they can issue a new record of decision fast. The consequences against the company will be minimal. If BLM gets their act together. Yeah, great. Counsel, you've exceeded your time. Okay, thank you. Thank you very much. Sorry about that. And Mr. Corley, we'll give you one minute. Thank you. So very quickly, we didn't forfeit the power and trust transition line issue. It was talked about extensively at the oral argument hearing and we briefed it. So I just wanna point that out in response to BLM's argument. Response to the question you wanted an answer to. So, I mean, Ms. Grenier has stated that there was thousands of pages and that's the response to why there's not misrepresentations about these springs. That thousands of pages doesn't fix this. And we're not talking about a battle of experts. We're not talking about counsel's interpretation. We're talking about the description, the narratives themselves in the surveys describing more flow than can be measured. Describing flow across multiple streams. And it's in the face of BLM's statements in the FEIS that there's zero flow in those springs and that it's supported by the surveys and the photographs. It's clearly a violation on to be dual. So what you've just heard from Ms. Grenier is just not true. And we've provided countless surveys and examples, record evidence that doesn't support the baselines in there. And the idea that we just sort of picked a handful, these are the springs that are important to a public land grazing permittee and private landowner in this area. My client's focused on the springs that matter to him, that he's dependent on for his livelihood in a region of the high desert that gets 10 inches of rain a year. So unless you have any other questions, we would ask this court to reverse on NEPA grounds. Great. Thank you and thank you to all the council for the very useful arguments. The case has been submitted and you're adjourned for the day. Okay. This court for this session stands adjourned.
judges: SMITH, LEE, VANDYKE